# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TIMMY HARTWELL, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION |
| LIFETIME DOORS, INC., | : | |
| Defendant. | : | NO. 05-2115 |
| | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                    February ___, 2006

Plaintiff Timmy Hartwell brings this employment discrimination, hostile work environment, and retaliation case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Hartwell, an African-American man who suffered an injury to his shoulder, claims that his former employer, defendant Lifetime Doors, Inc., discriminated against him and subjected him to a hostile work environment because of his race and disability and fired him in retaliation for his filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Presently before the court is Lifetime's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, I will grant Lifetime's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, Timmy Hartwell, is an African-American male. (Pl.'s Statement of Material Facts ¶ 1.) He applied for a job with Lifetime Doors at its Easton plant on May 13, 2003, was

1

hired, and started work as a laborer on May 19, 2003.  (*Id.* at ¶ 2.)  Within about a month, he was

promoted to Assistant Supervisor.  (*Id.* at ¶ 3.)

Hartwell injured his left shoulder on Friday, August 1, 2003 while lifting and stacking

doors.  (*Id.* at ¶ 4.)  He returned to work on Monday, August 4, 2003 with a physician's note

stating that he could not work on Tuesday or Wednesday of that week because he was scheduled

for medical tests.  (*Id.* at ¶ 5.)  Lifetime Doors then prepared a workers' compensation accident

report on August 15, 2003 (*Id.* at ¶ 6), and Hartwell was limited to light duty (Hartwell Dep.

84:21-22).  Also on August 15, Hartwell was examined at Redi-Care Medical Center and was

instructed not to return to work pending further evaluation.  (Pl.'s Statement of Material Facts at

¶ 7.)

Hartwell was reevaluated at Redi-Care on August 18, 2003, and the doctor determined

that he could return to work on limited duty.  (Pl.'s Statement of Material Facts ¶ 8.)  Hartwell

then returned to work on August 20, 2003, but his supervisor initially would not honor his work

restriction.  (*Id.* at ¶ 9.)  Accordingly, Hartwell complained to Peter Sarnac, the plant manager;

Ernie Keller, the assistant plant manager; and Randy Oswald, the safety supervisor.  (*Id.*)  This

apparently rectified the problem, because Hartwell has testified that from August 15, 2003 (and

for the remainder of his employment at Lifetime) he worked only on light duty.  (Hartwell Dep.

51:19-52:3, 70:7.)  Nonetheless, on August 21, 2003, Hartwell called Don Hyatt at Lifetime's

corporate headquarters and reported that he was suffering from unfair and discriminatory

treatment at work.  (Pl.'s Statement of Material Facts ¶ 10.)

On August 25, 2003, plaintiff was again examined at Redi-Care, and was referred to

Coordinated Health Systems ("CHS").  (*Id.* at ¶ 11.)  On September 2, 2003, CHS completed a

Physical Therapy Initial Evaluation, which explained that Hartwell's "signs and symptoms are consistent with that of left shoulder impingement" and noted that the long-term goal was to "return [Hartwell] to prior level of function pain free." (Def.'s Ex. 4 at 15.) During this initial visit the CHS physician extended light-duty restrictions and prescribed physical therapy. (Pl.'s Statement of Material Facts ¶ 12.) Those light-duty restrictions were again extended during subsequent visits on September 10, 2003; September 17, 2003; October 1, 2003; October 23, 2003; and November 20, 2003. (Id.) During this time period two doctors suggested surgery, but Hartwell opted for nonoperative care. (Def.'s Ex. 4 at 16; Hartwell Dep. 158:1-15.)

Eventually, Hartwell did have surgery. On January 28, 2004, Dr. Mark Lazarus conducted a left shoulder arthroscopic repair of Hartwell's superior labrum and biceps tenodesis as well as distal clavicle excision. (Def.'s Ex. 4 at 20.) At a follow-up examination on February 15, 2004, Dr. Lazarus determined that Hartwell should remain out of work for three weeks. (Pl.'s Statement of Material Facts ¶ 14.) On March 1, 2004, Dr. Lazarus released Hartwell to return to work with restrictions. (Id. at ¶ 15.) On March 12, 2004, Lifetime Doors offered Hartwell a position with light duties, which Hartwell accepted five days later. (Id.)

Plaintiff returned to work on March 17, 2004. (Id. at ¶ 16.) On his first day back, he heard his co-worker Randy Oswald say "black people like [Hartwell] make black people look bad."[1] (Id.; Hartwell Dep. 35:4-7.) On the following day, Hartwell heard Oswald make the same comment, more clearly and loudly. (Pl.'s Statement of Material Facts ¶ 17.) He also heard

---

[1] Hartwell's statement of material facts alleges, without equivocation, that he heard Randy Oswald say "black people like me make black people look bad." (Pl.'s Statement of Material Facts ¶ 16.) However, in Hartwell's deposition testimony, he displayed some uncertainty as to what exactly Oswald said, testifying that Oswald "mumbled" the comment, so that Hartwell "could hear like bits and pieces of the conversation." (Hartwell Dep. 35:4-7.)

Oswald use the word "nigger."[2]  Also on March 17, Peter Sarnac called Hartwell into his office. (*Id.* at ¶ 18.)  Sarnac criticized Hartwell for electing to communicate with Sarnac through a lawyer, rather than personally, while he was out from work recovering from surgery.  (*Id.*)

Hartwell also reported that upon his return to work he heard a co-worker say that due to his shoulder injury he was no longer big and tough, and that he could be taken out by hitting the shoulder.  (*Id.* at ¶ 19.)  The situation in which Hartwell heard this statement is unclear, however. In his affidavit and in prior testimony he stated that he overheard Oswald say this to Dennis Furry (Pl.'s Ex. 9 at 14:17-20; Pl.'s Statement of Material Facts ¶ 19); however, in his deposition testimony, Hartwell stated that Furry made this threat to him after the two had an argument (Hartwell Dep. 98:19-22).  Nonetheless, it is undisputed that Furry and Hartwell did have a heated argument on either March 23 or 24, which was prompted by Furry's mistaken belief that Hartwell had criticized his work performance to a supervisor.  (Hartwell Dep. 96:5-9.)  Later that day, Furry apologized to Hartwell (although Hartwell did not accept the apology).  (Hartwell Dep. 107:12.)  After the argument, Hartwell decided that he felt unsafe at work and told his supervisor, assistant plant manager Ernie Keller, that he was going to leave early.  (Hartwell Dep. 101:21-22.)

On Thursday, March 25, 2004, plant manager Sarnac saw Hartwell drive out of the parking lot before quitting time.  (Def.'s Statement of Material Facts ¶ 10.)  Hartwell does not dispute this.

---

[2] Hartwell did not allege that Oswald used this epithet while describing this incident in his affidavit or in his statement of material facts.  (Hartwell Aff. ¶ 16; Pl.'s Statement of Material Facts ¶ 16.)  However, he did make the allegation in his deposition testimony.  (Hartwell Dep. 34:15-16.)

Also on March 25, Hartwell filed a charge of discrimination with the EEOC, alleging racial and disability discrimination. (Pl's Statement of Material Facts ¶ 20.) Hartwell was not sure when Lifetime Doors would have received notice of the complaint (Hartwell Dep. 138:18-19); Sarnac has testified that he received notice on Monday, March 29, 2004 (Sarnac Aff. ¶ 12).

March 26, 2004 was Hartwell's last day of employment at Lifetime Doors. The circumstances around his separation from employment are in dispute. In Hartwell's version, he arrived to work at about 7:06 a.m., "a couple minutes late." (Pl.'s Statement of Material Facts ¶ 21; Hartwell Dep. 118:1-4). At this time, he was supervising two employees, Ryan Christman and Julio Delgado. (Pl.'s Statement of Material Facts ¶ 22.) He told the two men to work on flipping some doors, which they did until around 8:30. (*Id.* at ¶ 23.) When they finished that project, they took a break. (*Id.*) During the break, Hartwell called his workers' compensation lawyer, but the lawyer did not answer his phone. (*Id.* at ¶ 24.) Then Hartwell called his probation officer, Marie Marth, but she also failed to answer her phone. (*Id.* at ¶ 25.) Then Sarnac came out on the dock and he and Hartwell began to argue. (*Id.* at ¶ 26; Hartwell Dep. 122:8-15.) Sarnac told Hartwell that he was "tired of [Hartwell's] bullshit." (Pl.'s Statement of Material Facts ¶ 26.) Sarnac initially warned Hartwell to go back to work or he would be fired, but then said "no, as a matter of fact, you're fired." (Hartwell Dep. 123:4-10.) Upon being fired, Hartwell called his probation officer to inform her of this development. (Pl.'s Statement of Material Facts ¶ 28.) Again, he was unable to reach her. (*Id.*) Hartwell then called his lawyer again. (*Id.* at ¶ 29.) At 9:10 a.m., Marth called Hartwell at Lifetime and left a message with a secretary, and Hartwell was notified that he should come to an office to get this message. (*Id.* at ¶ 30.) Hartwell called Marth from Lifetime and told her that he had been fired, and she advised

5

him to leave the premises so that he would not be arrested for trespassing.  (*Id.* at ¶ 30-31.)  After

this conversation, Sarnac handed Hartwell his paycheck for the preceding week and said "you

know what I told you."  (*Id.* at ¶ 32.)  Hartwell then left the building and again called Marth.  (*Id.*

at 33.)  Hartwell's timecard showed that he punched out at 9:27, which, according to Hartwell,

was after he had exited the building.  (*Id.* at ¶ 37.)

　　　While I must accept Hartwell's version of disputed facts in ruling upon Lifetime's motion

for summary judgment, I will briefly recount Sarnac's version of the March 26, 2004 events to

highlight the fact that there is a dispute between the parties.  Sarnac has testified that his

confrontation with Hartwell occurred shortly after 7:00 a.m. (rather than 8:30 a.m.).  (Sarnac Aff.

¶ 8.)  Sarnac testified that he saw Hartwell on the dock shortly after starting time, and approached

him with the intent of confronting him about leaving work early the previous day without

permission.  (Sarnac Aff. ¶ 8.)  As he approached Hartwell, Sarnac heard Hartwell shouting into

his phone.  (Sarnac Aff. ¶ 8.)  Sarnac explained that his conversation with Hartwell was heated

and both men raised their voices.  (Sarnac Aff. ¶ 9.)  Sarnac stated that Hartwell asked multiple

times "why don't you fire me?"  (Sarnac Aff. ¶ 9.)  After Hartwell asked this for the third time,

Sarnac said "either go back to work or leave."  (Sarnac Aff. ¶ 9.)  Then Hartwell went back

inside.  (Sarnac Aff. ¶ 9.)  About two hours later, Hartwell came to Sarnac's office and said "I'm

done."  (Sarnac Aff. ¶ 10.)  Sarnac asked Hartwell if he was quitting, and Hartwell said "no, you

fired me."  (*Id.*)  Sarnac responded "no, I didn't."  (*Id.*)  Hartwell then asked for and received his

paycheck, handed Sarnac his timecard, and left.  (*Id.*; Pl.'s Ex. 1 at 47.)

　　　On March 28, 2004, Hartwell filed for unemployment benefits.  A Referee conducted a

hearing in which Hartwell, Sarnac, Keller, and three others testified.  The Referee determined

that Hartwell had been fired.  (*See* Hartwell Exs. 1-2.)

On April 19, 2004, Hartwell filed a petition to reinstate workers' compensation benefits, claiming that he had been fired from his position.  Lifetime Doors opposed Hartwell's petition, arguing that Hartwell had not been fired but had quit.  The Workers' Compensation Judge heard the testimony of Hartwell, Sarnac, and eleven other witnesses.  Ultimately, the WCJ determined that Hartwell had voluntarily quit his employment.  (*See* Def.'s Ex. 1.)  Hartwell then appealed, but ended up withdrawing his appeal after he and Lifetime reached a compromise agreement.[3]

On May 25, 2004, Hartwell filed a second charge of discrimination with the EEOC, alleging that he was terminated because of racial and disability discrimination.  (Pl's Ex. 6.)

On May 4, 2005 Hartwell filed a complaint with this court, alleging that he was fired because of his race and/or disability, that he was harassed due to his race and/or disability, and that he was fired in retaliation for filing a charge of discrimination with the EEOC.  Lifetime then filed a motion for summary judgment, seeking judgment on all counts.  As will be explained below, I will grant Lifetime's motion for summary judgment and enter judgment in its favor on

---

[3] Lifetime argues that the WCJ's decision should bind this court under the doctrine of collateral estoppel.  Three requirements must be met before the doctrine of collateral estoppel will apply: "(1) the issue decided in the prior adjudication must be identical to the one presented in the later action, (2) there must be a final judgment on the merits and (3) the party against whom the doctrine is asserted must have been a party or in privity with a party to the prior adjudication and have had a full and fair opportunity to litigate the issue in question in the prior action."  *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169 (3d Cir. 1999).  Here, as I determined previously in an order dated October 3, 2005, collateral estoppel is not applicable because the WCJ's findings had been appealed and the parties thereafter entered into a compromise agreement involving the payment of a substantial sum of money to the plaintiff in this action while the appeal was still pending.  *See Arizona v. California*, 530 U.S. 392, 414 (2000) ("[S]ettlements ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear, as it is not here, that the parties intend their agreement to have such an effect.).

all counts.

## LEGAL STANDARD

A court may only grant a motion for summary judgement, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy*, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"[4]

---

[4] Federal Rules of Civil Procedure Rule 56(c) provides that summary judgment shall be granted if "there is no genuine issue as to any material fact and that the moving party is entitled

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

## DISCUSSION

### I. Claims Regarding Race

#### A. Racial Discrimination

Hartwell has presented a claim under Title VII[5] alleging discriminatory discharge. However, because Hartwell has produced sparse evidence of discrimination and fails to link that evidence, directly or circumstantially, to his discharge, a reasonable jury could not find in his favor on this claim.

Courts analyze Title VII claims under either a mixed-motive analysis or a pretext analysis. *See Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 214 (3d Cir. 2000).  The

_____

to a judgment as a matter of law."  The Third Circuit has explained that "[i]n order to demonstrate the existence of a genuine issue of material fact, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993)).  Because the "reasonable jury" test is slightly easier to conceptualize than the "genuine issue of material fact" test, the court will use the former throughout the opinion, although the former test is merely another way of articulating the latter and does not change the inquiry in any way.  This test applies in considering both whether plaintiff is able to make a prima facie case and whether he is able to carry his ultimate burden.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (in affirming grant of summary judgment for the defendant, stating "the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case"); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000) ("A plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination.").

[5] Title VII provides that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

"mixed-motive" analysis was first described in *Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989). Under this analysis, the plaintiff has the initial burden and must show that the protected

trait was a "substantial factor" in the defendant's employment decision. *Fakete v. Aetna, Inc.*,

308 F.3d 335, 338 (3d Cir. 2002) (citing *Price Waterhouse*, 490 U.S. at 265-66). After the

plaintiff makes this showing, "the burden of persuasion on the issue of causation shifts, and the

employer must prove that it would have fired the plaintiff even if it had not considered" the

protected trait. *Id.* Initially, based on Justice O'Connor's concurring opinion in *Price*

*Waterhouse*, courts required the plaintiff to produce direct evidence to proceed under the mixed-

motive theory. *See id.* However, in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003),

the Supreme Court held that in a Title VII discrimination case, the plaintiff need not present

direct evidence,[6] but "need only present sufficient evidence for a reasonable jury to conclude, by

---

[6] The court notes that the mixed-motive test, originally described by Justice O'Connor in *Price Waterhouse* (whose concurrence the Third Circuit has determined "represents the holding of the fragmented Court in *Price Waterhouse*," *Fakete v. Aetna, Inc.*, 308 F.3d 335, 338 n.2 (3d Cir. 2002)) was designed "as a supplement to the careful framework established by [the Supreme Court's] unanimous decision[] in *McDonnell Douglas Corp. v. Green.*" *Price Waterhouse*, 490 U.S. 228, 261 (1989). In explaining her reasoning for supplementing the *McDonnell Douglas* test, Justice O'Connor emphasized that she did not believe "that the employer is entitled to the same presumption of good faith [as described in *McDonnell Douglas*] where there is direct evidence that it has placed substantial reliance on factors whose consideration is forbidden by Title VII." *Id.* at 271. Essentially, the mixed-motive test was created to rectify problems of causation; the plaintiff in *Price Waterhouse* "proved that Price Waterhouse 'permitt [ed] stereotypical attitudes towards women to play a significant, *though unquantifiable*, role in its decision not to invite her to become a partner.'" *Id.* at 272 (emphasis added) (quoting *Hopkins v. Price Waterhouse*, 825 F.2d 458, 461 (D.C. Cir. 1987)).

Two years after *Price Waterhouse*, Congress adopted the Civil Rights Act of 1991, which "respond[ed] to *Price Waterhouse* by setting forth standards applicable in mixed motive cases in two new statutory provisions." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003). The key new provision was 42 U.S.C. § 2000e-2(m), which states "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." In *Desert Palace*,

a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a

motivating factor for any employment practice.'" *Id.* at 101.

A plaintiff can also show racial discrimination under the pretext theory.  The Supreme

Court set forth the analytical framework for this theory in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie

case of discrimination.  *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000).  If the plaintiff

successfully establishes a prima facie case, the burden of production shifts to the defendant to

"articulate some legitimate, nondiscriminatory reason" for the employment decision.  *McDonnell*

*Douglas*, 411 U.S. at 802.  Once the employer comes forward with a legitimate,

nondiscriminatory reason, to survive summary judgment, the plaintiff must demonstrate by a

preponderance of the evidence "that the employer's articulated reason was not the actual reason,

---

the Supreme Court held that "direct evidence of discrimination is not required in mixed-motive cases" so that "[i]n order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice."  *Id.* at 101.

Thus, the Civil Rights Act of 1991 and *Desert Palace*, in removing *Price Waterhouse*'s direct evidence requirement, appear to also remove the rationale for the different evidentiary rules in pretext and mixed-motive cases.  The court also notes that the language in *Desert Palace* describing the plaintiff's burden in mixed-motive cases (the improper consideration "was a motivating factor for any employment practice") is similar to the language used by the Third Circuit's opinion in *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994), describing the second manner in which a plaintiff can show pretext (discrimination "was more likely than not a motivating or determinative cause of the employer's action").  Indeed, in *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1113-14 (3d Cir. 1997) (en banc), the Third Circuit explained that because a plaintiff failed to show pretext under the second *Fuentes* method, the plaintiff also failed to establish a mixed-motive claim, because both methods required a finding that the protected characteristic was a "determinative factor" in the employment decision.  Thus, the court will use similar reasoning in evaluating Hartwell's claims under both mixed-motive and pretext frameworks.

but rather a pretext for discrimination." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 n.5 (3d Cir. 1998).

It should also be noted that despite the shifting of intermediate evidentiary burdens, the ultimate burden of persuading the trier of fact that the employer acted with discriminatory intent remains on the plaintiff. *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995).

The court will analyze Hartwell's racial discrimination claims first under the pretext theory and then under the mixed-motive theory.

### 1. Pretext Theory

#### a. Step One- Prima Facie Case

As described above, in order to survive a defendant's summary judgment motion under the pretext theory, a "plaintiff must first produce evidence sufficient to convince a reasonable factfinder as to all of the elements of a prima facie case of discrimination." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). To establish a prima facie case for discriminatory discharge, a plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for an employment position, (3) he was discharged from that position, (4) "'under circumstances that give rise to an inference of unlawful discrimination.'" *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (quoting *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The "central focus of the prima facie case is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

The fourth prong is flexible, and thus courts do not employ the same test for every factual

situation. "[O]ne prima facie standard cannot apply 'in every respect to differing factual

situations.'" *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997)

(quoting *McDonnell Douglas*, 411 U.S. at 802 n.13). "[T]he nature of the required showing to

establish a prima facie case of disparate treatment by indirect evidence depends on the

circumstances of the case." *Marzano v. Computer Science Corp. Inc.*, 91 F.3d 497, 503 (3d Cir.

1996) (internal quotations omitted).

Here, there is no dispute that Hartwell, as an African-American, is a member of a

protected class. The parties also agree that Hartwell was qualified for his position. Also,

although the parties disagree about whether Hartwell was terminated or quit, for purposes of this

summary judgment analysis I must accept Hartwell's claim that he was fired. Thus, the only

issue is whether Hartwell is able to present sufficient evidence, which, if believed, could

convince a reasonable factfinder that he was terminated "under circumstances that give rise to an

inference of unlawful discrimination." *Waldron*, 56 F.3d at 494.

First of all, Hartwell does not present any evidence showing that "the position was

ultimately filled by a person not of the protected class," which is a common way for plaintiffs to

create an inference of discrimination. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d

1061, 1066 n.5 (3d Cir. 1996) (citing *Waldron*, 56 F.3d at 494). Indeed, Lifetime Doors has

stated that the position remains open. (Sarnac Aff. ¶ 11.) Also, Hartwell has neither argued that

he was treated differently than some similarly-situated white employee nor offered statistical

evidence showing discriminatory patterns.

Hartwell argues that he can show that his termination occurred "under circumstances that

give rise to an inference of unlawful discrimination," *Waldron*, 56 F.3d at 494, based on the

13

comments of Oswald and alleged discrepancies in Sarnac's description of the confrontation that preceded Hartwell's termination.

Oswald's statements, specifically those saying that Hartwell made black people look bad and calling Hartwell a "nigger," although entirely inappropriate and reprehensible, provide limited support for Hartwell's claim of discriminatory discharge because they were mere "stray remarks" made by a non-decisionmaker. The Third Circuit has explained that "comments by those individuals outside of the decisionmaking chain are stray remarks." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). Here, the "decisionmaking chain" only included a single person, Sarnac, the plant manager, who terminated Hartwell after having an argument with him. Hartwell has presented no evidence that Oswald was somehow involved in the decision to terminate him or that the decision was not made entirely by Sarnac. Indeed, Hartwell did not report to Oswald. (Hartwell Dep. 21:23-24.) Oswald was the safety supervisor at Lifetime, who only instructed Hartwell on safety issues. (Hartwell Dep. 21:17-24.) Accordingly, Oswald's statements were stray remarks, which, although available "to build a circumstantial case of discrimination," *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995), "standing alone, are inadequate to support an inference of discrimination." *Walden*, 126 F.3d at 521. Accordingly, Oswald's statements provide limited support for Hartwell's discriminatory discharge claim.

Hartwell also attempts to draw inferences from what he considers to be inconsistencies in Sarnac's testimony about the March 26, 2004 confrontation. Hartwell makes much of the fact

that Sarnac testified that he did not have "any real cause to fire" Hartwell.[7]  (Pl.'s Ex. 12 at 18:3-4.)  However, this statement is not extraordinary: Sarnac was merely discussing his state of mind while arguing that he did *not* fire Hartwell.  Hartwell also argues that Sarnac is lying about Hartwell quitting and that he can demonstrate this by impeaching Sarnac's testimony about the time of the confrontation and Sarnac's testimony that Hartwell handed him his timecard when he left.  Both sides produce evidence tending to support their accounts of these events.[8]  Since both sides have presented evidence, this is a genuine dispute of material fact, properly evaluated by a factfinder and not by the court in considering a motion for summary judgment.  Thus, for purposes of this motion, I must assume (because a reasonable juror could so find) that Sarnac fired Hartwell and tried to pretend that Hartwell quit.

---

[7] Under Pennsylvania law, Hartwell was an at-will employee so that Sarnac did not have to have cause to fire Hartwell; he just could not do so based on a discriminatory reason. *See Pipkin v. Pa. State Police*, 693 A.2d 190, 191 (Pa. 1997) (stating "as a general rule, Pennsylvania law holds that employees are at-will, absent a contract, and may be terminated at any time, for any reason or for no reason") (internal quotation omitted).

[8] Hartwell presented the testimony of Ryan Christman and phone records.  Christman, an employee of Lifetime who used to report to Hartwell, testified that he heard Sarnac fire Hartwell during their confrontation.  (Pl.'s Ex. 11 at 59:1.)  The phone records are for a phone registered to Tara Miller that Hartwell testified he was using on March 26, 2004.  (Pl.'s Ex. 14-B.)  The records show that a call was made to Hartwell's probation officer Marth at 9:13 a.m., during which call, Marth has testified, Hartwell said he was outside Lifetime.  Thus, Hartwell argues, he could not have punched out at 9:27 a.m.  Hartwell argues that this impeaches Sarnac's testimony that Hartwell handed Sarnac his timecard when he left.  The records also show that the first phone call made from that phone on March 26 occurred at 8:35 a.m., which Hartwell argues shows that he could not have been talking on the phone before 7:30 as Sarnac claimed.  Lifetime has presented testimony from Oswald and alternative phone records.  Oswald's testimony essentially corroborates Sarnac's version of the confrontation.  (Pl.'s Ex. at 118:22-119:12.)  Lifetime's phone records are for a phone with the number 610-653-3555, which Hartwell has explained was Lisa Williams's second line and which he sometimes borrowed.  (Pl.'s Ex. 12 at 64:4-23; Def.'s Ex. 4 at 26, 27.)  The records show that calls were made on March 26 at 7:22 a.m., 7:30 a.m., and 7:36 a.m. to the number 610-570-3477, another phone registered to Lisa Williams, which could have been the phone calls Sarnac observed Hartwell make.

Even assuming that Sarnac has been untruthful in claiming that he did not fire Hartwell, Hartwell fails to establish a prima facie case of discriminatory discharge because he fails to link Sarnac's alleged coverup to discriminatory animus and otherwise only presents stray remarks by another employee to support his claim.  This case is similar to *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003), where the court found that an individual of Native American heritage, whose co-workers sometimes "called him derogatory nicknames referencing his Native American heritage," failed to establish a prima facie case of discrimination because he did not "establish some causal nexus between his membership in a protected class" and the adverse employment decision.  Here, even if Sarnac did cover up the true facts of Hartwell's termination, Hartwell must link that suspicious behavior to racial discrimination.  The mere fact that Sarnac was untruthful about firing Hartwell does not show that Sarnac was motivated by racial hostility.  For example, Sarnac could have been claiming that Hartwell quit in order to avoid workers' compensation and unemployment compensation issues.  (*See* Pl.'s Ex. 12 at 18:1-3, where Sarnac discusses his concern about firing someone who is on workers' compensation.)

In summary, Hartwell presents evidence showing only that Oswald, a non-decisionmaker, made two racist comments, and that Sarnac fired Hartwell and pretended that Hartwell quit. Because Hartwell provides no link, direct or circumstantial, between these acts and his discharge, a reasonable jury could not find that he has presented a prima facie case of disparate treatment.

### b. Step Two- Employer's Legitimate Reason

Even if I were to determine that Hartwell has established a prima facie case, he would still fail to sustain his ultimate burden to prevent summary judgment. As noted above, the second step of the *McDonnell Douglas* analysis is for the employer to "articulate some legitimate,

16

nondiscriminatory reason" for the employment decision. *McDonnell Douglas*, 411 U.S. at 802.

"[T]he employer need only produce admissible evidence which would allow the trier of fact

rationally to conclude that the employment decision had not been motivated by discriminatory

animus." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981). This is a "relatively

light burden." *Fuentes*, 32 F.3d at 763.  The current case is unique because rather than offering

an alternative explanation for Hartwell's discharge, as normally occurs in the second part of the

*McDonnell Douglas* framework, Lifetime has steadfastly maintained that it did not fire Hartwell.

Hartwell argues that because Lifetime has claimed that it did not fire him, it cannot articulate a

nondiscriminatory reason, which would mean that he would prevail.  (Pl.'s Resp. 16-17.)

However, the court agrees with the Seventh Circuit's treatment of this factual situation, which

concluded that "such a result is obviously not the purpose of the statute nor of the burden-shifting

process established in *McDonnell Douglas/Burdine*." *E.E.O.C. v. Our Lady of Resurrection*

*Med. Ctr.*, 77 F.3d 145, 150 (7th Cir. 1996) (citations omitted).  Thus, the court stated that the

employer had "a right to offer a legitimate, nondiscriminatory reason for its actions regardless of

whether [the plaintiff] quit or was fired." *Id.* at 150.  Here, Sarnac has explained that he

confronted Hartwell about his leaving early the prior day, and that the two got into a heated

argument.  (Sarnac Aff. ¶¶ 8, 9.)  Thus, whether Hartwell quit or was fired, Lifetime would

explain that it was a result of an angry confrontation about Hartwell's leaving early the prior day.

As the Seventh Circuit articulated the issue, "[e]ven if a factfinder were to determine that [the

plaintiff] was fired, [the defendant's] proffered reason for termination would remain unchanged."

*Our Lady of Resurrection Med. Ctr.*, 77 F.3d at 150.  Thus, I find that Lifetime's explanation, for

purposes of this stage of the proceeding, is a legitimate, nondiscriminatory reason.  Accordingly,

17

Lifetime satisfies its burden at the second step.

### c. Step Three- Plaintiff's Demonstration of Pretext

After the employer comes forward with a legitimate, nondiscriminatory reason, in order to survive summary judgment the plaintiff must present evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson*, 142 F.3d at 644 n.5. The plaintiff may show pretext and defeat summary judgment "by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale*, 200 F.3d at 105 (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) and *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)). Here, Hartwell fails to present sufficient evidence for a reasonable jury to find pretext under either of the two methods.

Under the first option, a plaintiff can cast sufficient doubt on a defendant's legitimate non-discriminatory reason by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff who seeks to prove pretext under *Fuentes*'s first option must also show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109. Here, Hartwell presents no evidence, beyond mere speculation, that Sarnac fired him for any reason other than the one that Sarnac has offered. He admits that he and Sarnac had an argument and that their tempers flared. (Hartwell

18

Aff. ¶ 15.)  Further, Hartwell's challenges to Sarnac's account deal with details (such as the time of the confrontation) rather than the essence: Hartwell presents no evidence showing that Sarnac did not come to the dock to confront him about leaving early the previous day or that the argument did not escalate and lead to his termination.  As the Third Circuit has explained, "an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant . . . evidence that no discrimination had occurred."  *Goodman v. Pa. Turnpike Comm'n*, 293 F.3d 655, 673 (3d Cir. 2002).

In order to successfully challenge an employer's legitimate reason, the plaintiff must somehow explain why its explanation is implausible.  For example, in *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995), the plaintiff, a salesman, was fired for several reasons related to job performance.  However, the employer admitted that sales volume "represents the best simple measure of a salesperson's performance," and the plaintiff produced evidence showing that he had produced consistently good sales performances for twenty-three years, had received a bonus three months before he was fired, and was the only sales representative in his region who received such a bonus.  *Id.* at 332-34.  Based on this evidence the court held that a "factfinder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program-sales."  *Id.* at 332.  Here, Hartwell has presented no evidence challenging Lifetime's articulated reason, and accordingly no reasonable jury could find pretext under this method.

A plaintiff can also survive summary judgment by establishing evidence that would allow

the fact finder to reasonably "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class . . ., or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765). Again, Hartwell fails to make out the necessary showing under this method.  The only evidence of discrimination he points to comes from Oswald, who was not a decision maker.  As noted above,  "standing alone, [stray remarks] are inadequate to support an inference of discrimination." *Walden*, 126 F.3d at 521.  Stray remarks are all that Hartwell has presented. Further, Hartwell has presented no evidence that Lifetime had previously discriminated against other African-Americans or that it has treated non African-Americans more favorably. Consequently, Hartwell cannot survive summary judgment under part two of the *Fuentes* test. Since the court has already concluded that he failed under part one as well, it follows that he cannot defeat summary judgment under the scheme of proof set out in *McDonnell Douglas*.

### 2. Mixed-Motive Theory

As noted above, in order to proceed under the mixed-motive theory, Hartwell must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor" in Lifetime's decision to terminate his employment. *Desert Palace,* 539 U.S. at 101.  While Hartwell has presented evidence that an employee of Lifetime made inappropriate racial comments directed toward Hartwell, he has

failed to show that his race was a motivating factor in Lifetime's decision.[9]

Hartwell has alleged that Oswald made a number of inappropriate statements, including twice saying that he made black people look bad and once referring to him as a "nigger." Additionally, he has alleged that Sarnac fired him but claimed that he quit. However, as noted above, Oswald's comments are merely stray remarks by a non-decisionmaker, and as such "are inadequate to support an inference of discrimination." *Walden*, 126 F.3d at 521. Also, Hartwell has failed to link Sarnac's purported mischaracterization of his exit with racial animus. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). Hartwell has presented no evidence from which a reasonable jury could conclude that his termination was motivated by racial discrimination, so I find that he cannot defeat summary judgment under the mixed-motive theory.

**B. Hostile Work Environment**

In Hartwell's complaint, he alleged that "Beginning about March 17, 2004, Defendant's agents, servants and employees subjected Plaintiff to a patter[n] of invidious discrimination due to his race, color or national origin." (Compl. ¶ 27.) This statement seems to charge that he was subjected to a racially hostile work environment; while it lacks the word "harassment" that is included in his disability-based hostile work environment claim, an allegation of a "pattern of discrimination" properly charges the first two elements of the claim. Also, Hartwell alleged that he was harassed due to his race in his initial EEOC charge. However, Lifetime alleged in its

---

[9] As noted in footnote four, this inquiry is similar to that of the second part of the pretext test under *Fuentes*. Just as Hartwell has failed to show that an "invidious discriminatory reason was . . . a motivating or determinative cause of the employer's action," *Fuentes*, 32 F.3d at 764, he has failed to show "that race . . . was a motivating factor" in Lifetime's decision to terminate his employment, *Desert Palace,* 539 U.S. at 101.

motion for summary judgment that Hartwell did not present a claim of race-based hostile work environment, and Hartwell did not challenge that assertion in his response.  He has thus waived the issue.  Nonetheless, to complete the record, I will construe this section as a claim of race-based hostile work environment that purportedly began on March 17, 2004.  However, I will conclude that Lifetime's alternative argument that Hartwell has failed to proffer sufficient evidence for a reasonable jury to find that he suffered from severe or pervasive discrimination is correct, and will therefore grant Lifetime's motion for summary judgment on the issue.

To prevail on a Title VII claim sounding in the creation of a racially hostile working environment, a litigant must establish that "'(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular;[10] (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability.'"  *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)).

The Supreme Court has explained that "offhand comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Rather, the plaintiff must demonstrate that he suffered from extreme conduct that effectively changed "the terms and conditions of employment."  *Id.*

_____

[10] While the Third Circuit has at times stated that in order to make out a hostile work environment claim the plaintiff must show that the discriminatory harassment was "pervasive and regular," the court in *Jensen v. Potter*, No. 04-4078, 2006 WL 224002, at *3 n.3 (3d Cir. Jan. 31, 2006), emphasized that the correct standard is "severe *or* pervasive."  Accordingly, and despite the quotation above, in ruling on Hartwell's claims the court will use the "severe or pervasive" standard.

In determining whether the conduct at issue is sufficiently extreme, it is necessary to consider the "totality of the circumstances." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). As such, a hostile work environment analysis "must concentrate not on individual incidents, but on the overall scenario." *Id.* at 1484. Factors which may demonstrate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Here, Hartwell's hostile work environment claim fails because he has presented very limited evidence describing racial harassment. Hartwell has alleged that the pattern of discrimination commenced on March 17, 2004; however, he has only described two incidents of explicit racial harassment that occurred between March 17, 2004 and his last day of work, March 26, 2004. Both incidents involved Randy Oswald, during which Oswald allegedly said "black people like [Hartwell] make black people look bad," and used the word "nigger." (Hartwell Aff. ¶¶ 16-17.) Besides the incidents directly involving race, Hartwell has complained of Oswald's[11] remark that he could easily "take [Hartwell] out" by hitting his shoulder. (Hartwell Aff. ¶ 19.) The first two incidents (one of which Hartwell may not have heard clearly, *see supra* note 1) certainly constitute racial harassment. At least on its face, Oswald's statement that he could easily harm Hartwell was unrelated to race. *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (noting "[t]he fact that [defendant's] behavior toward [plaintiff]

---

[11] This is assuming that Oswald, rather than Furry, made this comment. Hartwell has presented differing accounts.

may have been offensive does not indicate that it was based on [plaintiff's race]."  Nonetheless, the Third Circuit has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001).  Thus, since Hartwell has alleged that Oswald made two other racist comments, I will accept that this third inappropriate statement was also racially motivated.

Even accepting these three incidents, Hartwell has failed to show a sufficient frequency or severity of discriminatory actions from which a reasonable jury could find a hostile work environment.  This situation is similar to that of *Page v. City of Pittsburgh*, 114 Fed. Appx. 52, at *2 (3d Cir. 2004), where the Third Circuit found that plaintiff had failed to establish the existence of a hostile work environment where her "allegations of discrimination [were] limited to a series of isolated incidents, all occurring in the month of October 1995, interspersed with a melange of complaints having little or nothing to do with race."  *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (internal citation omitted); *Kidd v. MBNA America Bank*, 93 Fed. Appx. 399, at *3 (3d Cir. 2004) (noting that "comments by a single coworker do not establish that discrimination was pervasive and regular"); *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990) ("Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere.").  Additionally, while the word "nigger" is morally repulsive, when it is used a single time it is not sufficiently severe to

show the existence of a hostile work environment.  *See King v. City of Philadelphia*, 66 Fed.

Appx. 300 (3d Cir. 2003) (determining that one racial epithet, one physical push, and one threat

to sabotage plaintiff's work record did not demonstrate a pervasive atmosphere of harassment);

*Maldonado v. Invensys Bldg. Systems, Inc.*, No. 05-1295, 2005 WL 3179500, at *2 (7th Cir.

2005) (stating "a single utterance of an epithet, while offensive, is not sufficient to establish a

hostile work environment") (citing *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566-67 (7th Cir. 2004));

*Singletary v. Mo. Dept. of Corrs.*, 423 F.3d 886, 893 (8th Cir. 2005) (explaining that "a plaintiff

[must] show more than a few [uses of racial epithets] over a course of years" to make out a

claim).

The Third Circuit has found that a plaintiff has successfully shown the existence of a

hostile work environment in cases where the plaintiff demonstrated a lengthy pattern of

harassment.  For example, in *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001)*, the Third

Circuit found that a Mexican-American made out a hostile work environment claim by

presenting evidence that his employer subjected him to ethnic slurs and comments; asked him in

cases of professional disagreements whether he intended to pull out a switchblade; spread word

that he was an affirmative-action hire; placed derogatory anonymous messages on the marker

board in his cubicle; rounded down his scores in performance evaluations, while those of non-

Hispanics were regularly rounded up; and disproportionately assigned minorities and trainees to

his unit.  Similarly, in *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996),

the Third Circuit found that a hostile work environment existed where African-American

plaintiffs showed that from 1986 through 1992 co-workers made inherently racist remarks,

including referring to them as "another one," "one of them," "that one in there," and "all of you";

other black employees were harassed on a daily basis by other employees, who warned them

"don't touch anything," and "don't steal"; plaintiffs were subjected to apparently false accusations

of favoritism, incompetence, and were made to do menial jobs; and several employees refused to

deal with one plaintiff even in matters where she was directly responsible, and these employees

were never reprimanded even though their actions were in direct violation of company policy.

Hartwell has alleged far fewer incidents of harassment than the plaintiffs in *Cardenas* and *Aman*;

indeed, he has alleged that three incidents occurred in less than two weeks.  Thus, I find that as a

matter of law Hartwell has presented insufficient evidence from which a reasonable jury could

find a hostile work environment.

## II. Disability Claims

### A. Disability Discrimination

Hartwell also alleges that he was discharged from his position due to his alleged

disability.  However, because plaintiff fails to present sufficient evidence for a reasonable jury to

find that he is disabled under the ADA, I will grant defendant's motion for summary judgment on

this issue.

Hartwell presents no direct evidence of discrimination based on his alleged disability, and

accordingly, the burden-shifting framework of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792

(1973), is applicable to his disability discrimination claim.[12]  *See Shaner v. Synthes (USA)*, 204

---

[12] The Supreme Court's opinion in *Desert Palace* was based on an interpretation of
provisions of the Civil Rights Act of 1991, and as such only expressly concerns discrimination
actions brought under Title VII.  The Third Circuit has held that in non-Title VII discrimination
cases, a plaintiff still must produce direct evidence to proceed under the mixed-motive theory.
*See Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 512 n.3 (3d Cir. 2004)

F.3d 494, 500 (3d Cir. 2000); *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999).  This framework contains the same three steps described above.

Pursuant to the *McDonnell-Douglas* framework, the court must first determine whether the plaintiff has successfully established a prima facie case of disability discrimination under the ADA.  The Third Circuit has held that "[i]n order to establish a prima facie case of disparate treatment under the ADA, a plaintiff must show '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination.'"  *Shaner*, 204 F.3d at 500 (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) and *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998)).

The ADA defines a qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A person is disabled "within the meaning of the ADA" if he has "[1] ]a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; [2] ]a record of such an impairment; or [3] has been] regarded as having such an impairment."  42 U.S.C. § 12102(2).

---

(requiring direct evidence in ADEA cases because the Civil Rights Act of 1991 only applies to Title VII cases).  Accordingly, a different standard is applicable to Hartwell's disability discrimination than his racial discrimination claims. *See Helfrich v. Lehigh Valley Hosp.*, No. 03-05793, 2005 WL 1715689 (E.D. Pa. July 21, 2005) (providing detailed discussion of issue).

The EEOC defines[13] "substantially limits" as being "unable to perform a major life activity that the average person in the general population can perform, or significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(1)(i-ii). It further defines "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *Id.* at § 1630.2(i).

Thus, in order to establish a prima facie case, Hartwell must first show that he was disabled under the ADA or regarded as disabled by his employer.

### 1. Hartwell's Argument that He Was Disabled

While Hartwell's complaint alleges that he was disabled under the ADA (Pl.'s Compl. ¶ 15), he has failed to allege or provide any evidence that his shoulder injury substantially limits any major life activity, which is required by the ADA.  *See* 42 U.S.C. § 12111(8).

Even if Hartwell had argued that his shoulder injury substantially limited his major life activity of working, the claim would still fail.  The Supreme Court has held that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).

---

[13] Since the statute does not define "substantially limits one or more of the major life activities," the court seeks instruction from the EEOC guidelines, which are entitled to substantial deference.  *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 143 n.4 (3d Cir. 1998) (en banc) (relying on EEOC guidelines for similar purposes and according them identical deference pursuant to the *Chevron* doctrine).

First of all, Hartwell's claim would fail because he only lists the restrictions that a physician has placed on his work and does not identify the class of jobs from which he claims he is disqualified as a result of his impairment.  In a case with similar facts, the Third Circuit has explained:

> [The plaintiff] argues that the restrictions placed upon his work by Dr. Cohen-that he was only capable of a "medium range of exertion"-limits his ability to perform "all super heavy and heavy jobs and all medium, light and sedentary positions requiring bilateral grip or repetitive use of the left extremity."  This assertion, however, only lists the restrictions that a physician has placed on [the plaintiff's] work; it does not indicate, as stated above, the class of jobs (e.g., meatpacker, pilot, chef) from which he is disqualified as a result of his impairment (and resulting restrictions). . . .  [The plaintiff cannot] avoid judgment as a matter of law simply by pointing to the restrictions that Dr. Cohen placed upon his work.

*Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 364 (3d Cir. 2000) (internal citation, footnote omitted).  Similarly, Hartwell has failed to point out a class of jobs from which he is disqualified, and thus is not disabled under the ADA.

Hartwell's claim must also fail because while his doctor limited him to light work upon his return, "[a]s a matter of law, a 'transient, nonpermanent condition,' *McDonald v. Commonwealth*, 62 F.3d 92, 94-97 (3d Cir. 1995), or 'a temporary, non-chronic impairment of short duration,' *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002), . . . fall short of substantially limiting an individual in a major life activity."  *Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751, 765 (3d Cir. 2004).  Indeed, the EEOC has suggested that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities," and provided the examples of broken limbs and strained joints.  EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(j).  While plaintiff's shoulder injury may have been more severe than a broken limb, there is no evidence that it is

29

permanent or of long-term duration.  He required surgery on his shoulder, and then underwent

physical therapy.  By the time of his deposition testimony in September 2005, Hartwell stated

that he was able to walk, stand, stoop, climb, sleep, eat, breathe, and care for himself in a normal

fashion.  (Hartwell Dep. 88:6-19.)  He stated that while he still had some aches and pains in his

shoulder, he had regained 80% of its function.  (Hartwell Dep. 88:4-5.)  Thus, while it took some

time for him to recover from his surgery, Hartwell has presented insufficient evidence for a

reasonable jury to find that he was disabled under the ADA.

### 2. Hartwell's Argument that He Was Regarded as Disabled

The EEOC guidelines define "regarded as having such an impairment" as having either 1)

"a physical or mental impairment that does not substantially limit major life activities but is

treated by a covered entity as constituting such limitation" or 2) "a physical or mental impairment

that substantially limits major life activities only as a result of the attitudes of others toward such

an impairment."  29 CFR § 1630.2(l)(1-2).  Based on this definition, our Court of Appeals

explicitly recognizes two circumstances in which an employer regards an employee as being

disabled.  The first occurs when an employer makes "an innocent misperception based on

nothing more than a simple mistake of fact as to the severity, or even the very existence, of an

individual's impairment."  *Deane v. Pocono Med. Ctr.*, 142 F.3d at 144; *see also Taylor v.

Pathmark Stores, Inc.*, 177 F.3d 180 (3d Cir. 1999) (holding that an employer's perception of

plaintiff's disability could be based on legitimate yet inaccurate medical information and

nonetheless subject the employer to liability).  The second circumstance occurs when an

employer's action is predicated largely on "society's myths, fears, stereotypes, and prejudices with

respect to the disabled."  *Deane*, 142 F.3d at 144; *see also School Bd. of Nassau Cty. v. Arline*,

30

480 U.S. 273 (1987) (holding that simply because an individual suffers from a contagious disease does not automatically justify denying her employment).

Hartwell presents five reasons why he believes that his employer regarded him as suffering from a disability. However, all of these arguments are without merit.

First, Hartwell argues that he was regarded as disabled because the defendant refused to honor his medical restrictions shortly after his work-related injury. (Pl.'s Resp. 20.) Hartwell made this allegation in his affidavit (Hartwell Aff. ¶ 19), but testified during his deposition that he was always assigned to light-duty work after he injured his shoulder in August of 2003 (Hartwell Dep. 84:13-85:3). However, even accepting his affidavit's explanation, this does not show that Lifetime somehow considered his impairment more serious than it actually was. The opposite actually appears to be the case: if Lifetime did not honor Hartwell's restrictions, it must have perceived him as less disabled than he truly was, not more.

Second, Hartwell argues that his supervisors knew that he had complained of discrimination. (Pl.'s Resp. 20.) However, the part of the record that Hartwell cites in support of this claim describes purported racial discrimination, rather than disability discrimination, and accordingly provides no support for this claim.

Third, Hartwell alleges that his co-workers blamed his injury for their failure to obtain a raise. (Pl.'s Resp. 20.) However, this argument also fails to demonstrate that Hartwell was regarded as disabled. Even if Hartwell's co-workers did believe that they received less money due to his injury, it does not mean that they believed that Hartwell was disabled. These are two entirely different points.

Fourth, Hartwell claims that a supervisor, Lester, complained when he returned to work

31

after surgery.  (Pl.'s Resp. 20.)  This is second-hand information, testified to by Julio Delgado, one of the men who worked under Hartwell, and as hearsay is not legally admissible to combat a summary judgment motion.  *See* Fed. R. Civ. P. 56(e).  Moreover, even if the evidence can be considered, it is altogether too vague to properly make out a regarded as claim.  The statement does not explain why Lester complained: it could have been due to any number of  problems that he had with Hartwell, and could have been prompted by something as commonplace as a personality conflict.  *See Walton*, 168 F.3d at 667 (noting that "[a] personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability") (quoting *Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997)).  Additionally, like Hartwell's other arguments, this fails to link the purported criticism of Hartwell to the employer's perception of the severity of Hartwell's condition.  To reiterate, a regarded as disabled claim is operative when an employee is not actually disabled but the employer believes that he is, and treats him as such.

Finally, Hartwell alleges that his employer regarded him as being disabled because Peter Sarnac expected him to return to work three days after his shoulder surgery.  (Pl.'s Resp. 20.) While this does appear to be an inappropriate expectation, it actually tends to show that Sarnac mistakenly regarded Hartwell as less disabled than he truly was, not more.

Thus, Hartwell fails to provide sufficient evidence for a reasonable jury to find that his employer regarded him as disabled.  Contrary to cases where plaintiffs successfully showed that their employers regarded them as disabled, Hartwell provides no evidence that Lifetime overestimated his limitations.  *See*, *e.g., Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 767 (3d Cir. 2002) (plaintiff regarded as disabled where his employer thought that he

was unable to be in the presence of firearms, when he actually was just unable to carry a firearm); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3d Cir. 1999) (plaintiff regarded as disabled when employer erroneously concluded that plaintiff's ankle injury prevented him from performing jobs involving standing, walking, and lifting).

Accordingly, because Hartwell fails to provide sufficient evidence for a reasonable jury to find that he was disabled or that his employer regarded him as disabled, he does not make out a prima facie case of disability discrimination under the ADA.  Thus, I will grant Lifetime's motion for summary judgment on this point.

### B. Hostile Work Environment

In his complaint, Hartwell alleges "[i]immediately upon Plaintiff's return from surgery, Defendant's servant, agents and employees began a pattern of invidious discrimination against and harassment directed to Plaintiff solely due to his disability or perceived disability."  (Pl.'s Compl. ¶ 13.)  However, because plaintiff has failed to provide sufficient evidence for a reasonable jury to conclude that he was disabled and that he was subject to severe or pervasive harassment, I will grant defendant's motion for summary judgment on this claim.

In order to demonstrate a disability-based hostile work environment, Hartwell must show that: (1) Hartwell is a qualified individual with a disability under the ADA; (2) Hartwell was subject to unwelcome harassment; (3) the harassment was based on Hartwell's disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of Hartwell's employment and to create an abusive working environment; and (5) Lifetime Doors knew or should have known of the harassment and failed to take prompt, effective remedial action.  *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 666-67 (3d

33

Case 2:05-cv-02115-WY   Document 37   Filed 02/16/06   Page 34 of 40

Cir. 1999) (assuming, without deciding, that such a cause of action exists).

Here, Hartwell's hostile work environment claim is without merit.  First of all, as discussed above, Hartwell has not provided evidence that he was disabled under the ADA, because he has failed to show that his ailment was permanent and because he has failed to allege a class of jobs from which he was disqualified due to his injury.  Also, Hartwell has not provided evidence that he was regarded as disabled by his employer.  Thus, Hartwell has failed to show that he is an "individual with a disability under the ADA."

Additionally, Hartwell fails to argue the other elements of hostile work environment in his response.  Indeed, he has failed to present evidence that he was harassed so severely or pervasively so as to alter the conditions of his employment.  The few incidents that he has described that concern his disability at all appear to be incidental to, rather than based on, his disability.  For example, he has stated that some of his co-workers questioned whether he was really injured elsewhere rather than at work.  (Hartwell Dep. 55:14-56:11.)  While this questioning was "based on" his disability insofar as the disability was a necessary predicate to the questioning, the attack seems more directed at Hartwell's integrity than his injury.  Also, Hartwell has stated that Oswald said that he would be easier to harm due to his shoulder injury.  This appear to be a general taunt more than harassment based on Hartwell's injury.  Nonetheless, even if I determined that Oswald's statement were harassment based on Hartwell's disability, a single incident is insufficient to show a severe or pervasive pattern of discrimination.  *See supra* I.B.  Thus, even if Hartwell were to be disabled under the ADA, I find that he has failed to produce sufficient evidence for a reasonable jury to find a hostile work environment.  Accordingly, I will grant Lifetime's motion for summary judgment on this claim.

34

## III. Retaliation

Hartwell also alleges that Lifetime terminated his employment in retaliation for his filing a charge of discrimination with the EEOC alleging racial and disability discrimination.  (Compl. ¶ 41.)  Lifetime argues that Hartwell failed to exhaust his administrative remedies and that therefore this charge should be dismissed.

Retaliation claims are subject to the same *McDonnell Douglas* burden-shifting framework as discrimination claims.  *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).  Accordingly, the plaintiff must first establish a prima facie case of retaliation.  To establish a prima facie case of retaliation, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).  If a plaintiff establishes the prima facie case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its adverse employment action.  *Woodson*, 109 F.3d at 920.  If the defendant satisfies its burden, then the plaintiff must prove that the proffered reason was merely a pretext and that in actuality, "'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process.'"  *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

Here, Hartwell alleges that he engaged in the protected activity of making an EEOC complaint, and that he was fired as a result of that activity.  It is undisputed that Hartwell's filing

of an EEOC complaint was a protected activity. *See Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir. 1997).

However, before filing a suit claiming violations of Title VII, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC. *See Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984). The ensuing suit is limited to claims that are within the scope of the original administrative charge. *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996). The Third Circuit has explained that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976) (internal citations omitted). While the Third Circuit has stated that "the scope of [an EEOC] charge should be liberally construed" because "charges are most often drafted by one who is not well versed in the art of legal description," *Hicks v. ABT Assocs. Inc.*, 572 F.2d 960, 965 (3d Cir. 1978), there are limits. The Third Circuit has "expressly declined to adopt the per se rule" that "held that all claims of 'retaliation' against a discrimination victim based on the filing of an EEOC complaint are 'ancillary' to the original complaint, and that therefore no further EEOC complaint need be filed." *Robinson v. Dalton*, 107 F.3d 1018, 1024 (3d Cir. 1997) (citing *Waiters*, 729 F.2d at 237 n.10). Here, Hartwell did not explicitly include a retaliation charge in either of his two EEOC complaints. Accordingly, I must determine whether Hartwell's retaliation claims are "reasonably within the scope of the complainant's original charges and if a reasonable investigation by the EEOC would have encompassed the new claims." *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208 (3d Cir. 1984).

36

Hartwell's second charge of discrimination, which he filed with the EEOC on May 25, 2004, stated "I immediately encountered racial and disability discrimination on my return.  I was fired on March 26, 2004, after filing a discrimination charge with the EEOC dated March 25, 2004.  My termination was because of my race and my disability."  (Pl.'s Ex. 6.)  In the section of the form where Hartwell was instructed to check the boxes representing the specific types of unfair treatment that he suffered, he checked the boxes representing race and disability discrimination but not the one labeled "retaliation."  (*Id.*)  Hartwell certainly could have been more artful in the presentation of his claim: indeed, the EEOC conducted no investigation with respect to any claim of retaliation.  (Mitchell Aff. ¶ 10.)  Nonetheless, I find that his description of the claim caused retaliation to be reasonably within the scope of the original charges and that a reasonable investigation by the EEOC should have encompassed a retaliation charge.  Hartwell's explanation of his claim stated that he was fired a single day after filing a discrimination charge with the EEOC.  While he emphasized race and disability discrimination in the next sentence, his sentence tentatively linking the date of his termination to the date of his first EEOC filing should have been sufficient to alert the EEOC to a potential retaliation claim.  Further, the court is mindful of the Third Circuit's directive that I liberally construe EEOC charges.  *Hicks v. ABT Assocs. Inc.*, 572 F.2d at 965.  Accordingly, I conclude that Hartwell sufficiently exhausted his administrative remedies regarding this retaliation claim.

However, I conclude that Hartwell has failed to exhaust his administrative remedies with respect to a claim that he was fired in retaliation for his prior complaints to management and

corporate headquarters.[14]  While his second EEOC charge contained sufficient information to

alert the EEOC that he may have been discharged in retaliation for filing an EEOC charge, it did

not even hint that he had ever complained to his supervisors or corporate headquarters, let alone

claim that he may have been retaliated against for doing so.  These allegations would have

required an investigation of an entirely different nature than the one contemplated by his EEOC

filings, and were neither investigated by the EEOC nor "reasonably within the scope of the

complainant's original charges."  *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208 (3d Cir.

1984); *see Porchia v. Cohen*, No. 98-3643, 1999 WL 357352 (E.D. Pa. June 04, 1999)

(dismissing plaintiff's retaliation claim where plaintiff's EEOC complaint alleged sexual assault

and harassment but not retaliation); *Fieni v. Pocopson Home*, No. No. 96-5343, 1997 WL

220280 (E.D. Pa. April 29, 1997) (dismissing plaintiff's retaliation claim where plaintiff's EEOC

complaint alleged disability discrimination but not retaliation).  This case presents different facts

than *Waiters*, where the Third Circuit found that the plaintiff's claim of retaliatory discharge was

within the scope of her EEOC charge because while the EEOC charge did not allege retaliatory

discharge, it did allege different forms of retaliation that occurred before she was fired.  729 F.2d

at 238.  Here, Hartwell did not allege retaliation in any form.  Additionally, Hartwell filed his

second EEOC charge *after* he was fired, yet still did not specifically allege retaliation.  Thus, he

is not now alleging a violation that occurred after his EEOC filing, but one that he simply

neglected to include in his filing.  Accordingly, because Hartwell's EEOC claims could not have

---

[14] In his complaint, Hartwell only alleged retaliation based on his filing of an EEOC
charge.  (Compl. ¶ 41.)  However, his response to the motion for summary judgment alleges that
Lifetime "knew Plaintiff made complaints of racial discrimination prior to the first formal charge
of discrimination" and also refers to "Plaintiff's discrimination complaints to corporate
headquarters in South Carolina."  (Pl.'s Resp. 22-23.)

put the organization on notice that he may have been retaliated against for complaining to his supervisors, I conclude that Hartwell failed to exhaust his administrative remedies for such a claim.

Although Hartwell did properly exhaust his administrative remedies for his claim alleging that he was retaliated against for filing an EEOC complaint, I conclude that this claim is meritless as a matter of law.  Hartwell has failed to provide any evidence of the requisite causal link between his protected activity and his discharge.  He signed his first EEOC charge on March 25, 2004, just before his employment was terminated on the morning of March 26, 2004.  However, the key date here is not the date that Hartwell filed or signed his EEOC charge, but the date that Sarnac or Lifetime received notice of the charge.  *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989) (stating that plaintiff "demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [the employer's] receipt of notice of Jalil's EEOC claim.").  Sarnac has testified that he first saw the EEOC charge on March 29, 2004, when a copy arrived in the mail at Lifetime.  (Sarnac Aff. ¶ 12.)  Hartwell has presented no contrary evidence.  Thus, Sarnac could not have retaliated against Hartwell for filing an EEOC charge when he did not know that Hartwell had done so.  Accordingly, because there is no genuine factual dispute as to whether Lifetime had notice of the EEOC charge before firing Hartwell, Hartwell cannot make out a prima facie case of retaliation and summary judgment is appropriate against Hartwell's retaliation claim.

Thus, I will grant Lifetime's  motion for summary judgment and enter judgment in its favor against Hartwell.

An appropriate order follows.

39

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TIMMY HARTWELL,                          :
Plaintiff,                               :
                                         :
                                         :
            v.                           :        CIVIL ACTION
                                         :
LIFETIME DOORS, INC.,                    :        NO. 05-2115
Defendant.                               :
                                         :
                                         :
                                         :
                                         :
                                         :

## Order


        AND NOW, this _____ day of February, 2006, upon consideration of defendant Lifetime

Doors' motion for summary judgment (Doc. No. 17), plaintiff Timmy Hartwell's response, and

Lifetime Doors' reply, it is hereby ORDERED that Lifetime Doors' motion for summary

judgment is GRANTED and judgment is ENTERED in favor of defendant Lifetime Doors, Inc.

and against plaintiff Timmy Hartwell.



                                    \s William H. Yohn, Jr., Judge
                                    _____
                                    William H. Yohn, Jr., Judge